**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE THE MATTER OF: | ) | |
| | ) | |
| JARED PRYZCZ, | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 21-CV-2538** |
| **v.** | ) | |
| | ) | **Honorable Thomas M. Durkin** |
| WILLOWBROOK FORD, INC: FORD MOTOR | ) | |
| COMPANY, INC: KIA MOTORS AMERICA, | ) | |
| INC: and BRIAN ZAWARUS, in his individual | ) | |
| capacity, | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S RESPOSE TO DEFENDANTS' RULE 56.1**
**STATEMENT OF MATERIAL FACTS**

Plaintiff, Jared Pryzcz ("Mr. Pryzcz" or "Plaintiff"), pursuant to Local Rule 56.1 (b)(3) submits the following response in opposition to Defendant WILLOWBROOK FORD, INC., et al.'s ("Defendants") Statement of Uncontested Material Facts as part of Defendant's Motion for Summary Judgment:

**JURISDICTION AND VENUE**

1. Jurisdiction of this Court is proper under 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States: specifically, Title VII of the Civil Rights Act of 196442 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1866 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991. [Ex. A ¶ 5-6]

2. Venue is proper in this Court under 28 U.S.C. § 1391 because all the occurrences pertinent to this lawsuit have occurred within the Northern District of Illinois, and all parties are located therein. [Ex. A ¶ 7]

3. Plaintiff timely filed his Charge of Discrimination with the Equal Employment

Opportunity Commission ("EEOC"), received a Notice of Right to Sue, and timely filed the instant cause of action. [Ex. A ¶ ¶ 9-10]

## WILLOWBROOK FORD, INC.

4.      Willowbrook Ford, Inc. ("Willowbrook Ford") is an equal opportunity employer with employees of every ethnic, racial, and religious group. [Ex. B ¶ ¶ 6-8]

Response: Disagree that Willowbrook Ford is an equal opportunity employer. Willowbrook has a pattern and practice of discrimination against its employees.

5.      Willowbrook operates two adjacent new car dealerships: a Ford dealership located at 7301 Kingery Highway and a Kia dealership located at 7335 Kingery Highway, both located in

Willowbrook, Illinois.  [Ex. B ¶¶ 1-3, Ex. C, p. 332, lines 13 -23]

Response: Agreed.

6.      During the employment of Jared Pryzcz ("Plaintiff"), Alan Meyer was President and Treasurer of Willowbrook and Khalil lstanbouli, an Arab American, was the Secretary and second highest officer of Willowbrook. [Ex. B ¶¶ 4, 13]

Response: Agreed.

7.      Brian Zawarus is the General  Manager over both dealerships; however, each dealership maintains its own Finance Managers, General Sales Manager, Sales Managers and salesforce. [Ex. B ¶ ¶ 3, 5]

Response: Agreed.

## PLAINTIFF' S BACKGROUND AND EMPLOYMENT

8.      Plaintiff worked for Zeigler Auto Group from April 2017 - March 2018 and was terminated for poor performance. [Ex. C, p. 42, line 20 -p. 43, line 11, Ex. 7]

Response: Agreed.

9.      Immediately prior to becoming employed by Willowbrook, Plaintiff worked for Evergreen Kia and there exists documentation of at least fifteen (15) instances of

disciplinary action from April 2018 -July 2018. [Ex. C, p. 44, lines 4-17, Ex. 8]

Response: Agree that there are disciplinary documents on his record. Disagree that these disciplinary incidents were legitimate. Plaintiff states he disagreed with the way the company did business, and that led to his discipline. [Ex. C, p. 44, lines 14-17]

10.     According to Plaintiff, his father is Arabic, but he uses his mother's surname, which is Polish. [Ex. C, p. 52, line 8-19]

Response: Agreed.

11.     Willowbrook did not track the race or national origin of its employees and Willowbrook management did not know that Plaintiff was Arabic. [Ex. B ¶¶ 11-12; Ex. C, p. 8, lines 5- 18]

Response: Agree that Defendant does not track national origin. Disagree that management did not know Plaintiff was Arabic. Plaintiff, as well as his former co-worker, attest that all the employees were aware of Plaintiff's national origin.   [Ex. C , p. 100, line  13-102, line  5; Decl. of Anthony LaGiglio ¶ 24; Decl. of Anthony Green, ¶ 25.]

12.     Although Plaintiff had an opportunity to personally work with him, Plaintiff similarly claims that he was not aware that Willowbrook's longtime Chief Financial Officer, Khalil Istanbouli, was of Arabic ancestry. [Ex. C, p. 60, lines 11 -22; p. 120, lines 8 - 10]

Response: Agreed.

13.     Plaintiff, who was hired as a Sales Manager on August 13, 2018, claims the first instance of alleged harassment had to do with his medical condition, but he does not recall reporting it to any member of Willowbrook management. [Ex. B ¶¶  9-10; Ex. C, p. 57, line 9 -p. 61, line 4]

Response: Agreed.

14.     Plaintiff claims the second instance of harassment also had to do with him needing time off for his medical condition, but does not recall reporting it to any member

of Willowbrook management. [Ex. C, p. 61, line *5* -p. 63, line 5]

      Response:  Agreed.

      15.    Plaintiff claims the other instances of harassment were times when he was blamed for minor things, including the lights going out, and claims he mentioned it to Mende Talevski. [Ex. C, p. 63, line 6 -p. 64, line 4]

      Response: Agreed.

      16.    Plaintiff claims Brian Zawarus harassed him when Plaintiff was reprimanded and written up for failing to order a seat for a customer's Sedona. [Ex. C, p. 69, line 20 -p. 72, line 3; Ex. D, p. 53, line 16-p. 57, line 5]

      Response: Agreed.

      17.    Plaintiff never complained to any member of Willowbrook management that he felt he was being harassed on the basis of his Arabic ancestry. [Ex. C, p. 73, line 18 - p 74, line 13; Ex. B   14; Ex. E ¶¶ 24-26]

      Response:  Disagree. Plaintiff did not state that he never complained to Willowbrook management.  He stated he did not recall ever complaining to Willowbrook management.  [Ex. C. p. 74, lines 6-13] Since these incidents occurred nearly three years ago, Plaintiff's inability to recall does not preclude the possibility that he complained to management.

      18.    Plaintiff claims that during the termination meeting, Brian Zawarus claimed that he belonged in a sub-prime store and Plaintiff believes that is because he came from Evergreen Kia, which is a sub-prime store. [Ex. C, p. 83, line 8 -p. 85, line 19; Ex. D, p. 63, line 3 - 15]

      Response:  Agree that Plaintiff stated he had come from a subprime store.  However, Plaintiff also stated that he believed this statement was related to the reputation of sub-prime stores having primarily minority and low-income customers.  He believed that this statement was race-based harassment.  [Ex. C, p. 84, line 17-p. 85, line  13]

19.     According to Brian Zawarus, a sub-prime store would have customers with lesser credit record that needed help in purchasing a vehicle, however, both Mr. Zawarus and Mr. Talevski deny that any such comment was made. [Ex. D, p. 58, line 13 - p. 60, line 3; Ex. E, ¶¶ 33-34; Ex. E ¶¶ 22-23]

Response:  Agree that they denied this statement was made.

20.     As General Sales Manager and then General Manager, Brian Zawarus participated in both the decision to hire Plaintiff and the decision to terminate his employment. [Ex. D, p. 31, lines 12 -22; p. 34, line 6 -p. 35, line 19; p. 38, line 17-p. 42, line 17]

Response:  Agreed.

21.     While Plaintiff claimed to have been taunted on the basis of his Arabic background while working for the Kia dealership, he could only remember one instance where a manager at the Ford dealership made a comment about explosives, and Plaintiff does not recall reporting it to management. [Ex. C, p. 101, line 11-p. 103, line 5]

Response: Disagree that Plaintiff could only recall one incident.  He could only recall one *specific* incident, but stated that his co-workers and supervisor made comments about his race and national origin on a regular basis.  [Ex. C, p. 101, lines 11-18]

22.     While Plaintiff claims that Caucasian managers were treated more favorably, he contends that Bill Parks, a Caucasian Sales Manager, was allegedly fired for harassment of female employees. [Ex. C, p. 80, line *5* -21; Ex. B 60]

Response:  Agree that Plaintiff stated that Mr. Parks was fired.  However, Mr. Parks engaged in harassment, which does not make him a valid comparator for Plaintiff.

23.     While Plaintiff claims that Caucasian managers were treated more favorably, Dustin Hill, a Caucasian Finance Manager, was actually terminated for theft and prosecuted. [Ex. C, p. 107, line 9 -p. 108, line 6, p. 147, line 3 - 8; Ex. B ¶¶ 61, 65-66]

Response:  Disagree that Mr. Hill is a valid comparator.  Plaintiff was never accused

of theft.

24. While Plaintiff claims that he was responsible for an increase in sales of 40% while employed by Willowbrook, he admits that there was only one month that was increased by 40%, he cannot recall which month that was. [Ex. C, p. 119, line 4 -p. 121, line 7, p. 125, line 14 -p. 127, line 21; Ex. 14]

Response:   Agreed.

25. According to Kia N. America's published records, the number of cars sold actually decreased significantly during Plaintiff's employment. [Ex. C, p. 119, line 4 - p. 121, line 7, p. 125, line 14 -p. 127, line 21; Ex. 14]

Response:  Disagree.  Defendant did not provide relevant records to verify this contention.  However, even if it is true, Plaintiff's employment coincided with the COVID-19 pandemic, which caused major disruption in auto sales nationwide. Therefore, any decrease in sales cannot be attributed to Plaintiff.

26. Plaintiff alleges that Anthony Green, another minority, was also treated less favorably, however, Plaintiff is aware of one instance of discipline toward Mr. Green, admits that he was not aware of disciplinary matters that may have been brought by other managers, and never reviewed Mr. Green's personnel file. [Ex. C, p. 128, line 9 -p. 132, line 3; p. 256, line 16-p. 257, line 5]

Response:  Agreed.

27. While Plaintiff claimed he had only been disciplined once while employed by Willowbrook, he later admitted that he was also disciplined for incorrect documentation on credit applications. [Ex. C, p. 54, line 8 - 14; p. 158, line 1-p. 159, line 14, Ex. 16]

Response:  Admitted that Plaintiff was disciplined once for incorrect documentation.  However, he stated this was related to misspelling a name, not to altering financial records.  [Ex. C. p. 158, line 21-p. 159, line 4.

28. Plaintiff also admitted that on April 29, 2019, he signed an Integrity Policy

regarding submitting credit applications in an ethical manner. [Ex. C, p. 159, line 14 -p. 161, line 10, Ex. 17]

Response: Agreed.

29.    Plaintiff received another disciplinary write up on July 22, 2020, for failing to include a check request from the customer for the last three payments, costing Willowbrook $2,386.00. [Ex. C, p. 162, line 16 -p. 163, line 1, Ex. 19; Ex. D, p. 119, line 12 -p. 120, line 4]

Response: Agreed.

30.    While Plaintiff admits that he was the Sales Manager of record in VinSolutions on each of the deals with altered records presented to him, and that his signature appears on the Purchase Agreements recap sheets, and credit applications, he claims that Willowbrook cannot prove that it wasn't the Finance Manager or someone else who altered the records. [See Statements of Fact ¶ ¶ 64 - 70; Ex. E ¶ ¶ 5-17]

Response:  Agreed.

31.    Plaintiff believes he was harassed and put under a microscope because Willowbrook wanted to get rid of him and hire a Certified Pre-Owned Manager and not because of his father's ancestry. [Ex. C, p. 72, line 4 -p. 73, line 17]

Response: Agree that Plaintiff stated that as one possible motivation.  However, Plaintiff maintains that his race and national origin were the primary reasons for his termination.

32.    Plaintiff also claims his termination is related to his failure to testify in the Green matter, however, there was no lawsuit filed in the Green matter and no need for any testimony. [Ex. B if 64; Ex. C, p. 260, line 15 -p. 262, line 23; Ex. 62]

Response:  Agreed.

## WILLOWBROOK'S RELATIONSHIP WITH FORD AND KIA

33.    Ford Motor Company and Kia America, Inc. (collectively, at times, referred

to as the "Manufacturers") are contracting parties with Willowbrook to Dealer Sales and

Service Agreements ("Dealer Agreements"), which govern the relationship and, among

other things, require the Dealers to act with integrity and to deal fairly with the public. [Ex.

B ¶16]

Response: Agreed.

34.    The Kia Dealer Agreement also allows Kia to terminate the Dealer

Agreement upon 90 days' notice for, among other things: (i) the Dealers; failure to comply

with the law or regulations relating to the sale or service of Kia products; and (ii) any civil

or administrative liability which adversely affects the goodwill of Kia. [Ex. B ¶¶ 17-18]

Response: Agreed.

35.    The Kia Dealer Agreement also requires Willowbrook to indemnify Kia for:

(i) the Dealer's alleged failure to comply, in whole or in part, with any obligations assumed

by DEALER pursuant to this Agreement; and (ii) the Dealer's alleged misleading

statements, misrepresentations, or deceptive or unfair trade practices. [Ex. B ¶ 19]

Response: Agreed.

36.    The Ford Dealer Agreement provides, among other things that: (i) the Dealer

shall employ and train competent personnel of good character, as will enable the Dealer to

fulfill all his responsibilities under this agreement; and (ii) the Dealer shall avoid in every

way any "bait",

deceptive, misleading, confusing or illegal advertising or business practices. [Ex. B ¶ 20]

Response: Agreed.

37.    The Ford Dealer Agreement also allows Ford to terminate the Dealer

Agreement for, among other things: (i) any conduct by any such person unbecoming a

reputable businessman; or (ii) disagreement among the parties, which in the Company's

opinion tends to affect adversely the operation or business of the Dealer or the good name,

goodwill or reputation of the Dealer, other authorized dealers of the Company, the Company, or Company Products. [Ex. B ¶ 21]

Response: Agreed.

FINANCING SOURCES

38.    When Willowbrook sells a motor vehicle, the consumer typically applies for financing through the dealership. [Ex. B ¶ 22]

Response: Agreed.

39.    A Sales Manager is in charge of filling out the electronically submitted credit application and submission of that application to the Finance Sources for his files through VinSolutions. [Ex. B if 23; Ex. E ¶¶ 1-11]

Response: Agreed. However, the Sales Manager is not solely responsible for this task. The Finance Manager has the ultimate responsibility for verifying financial information. (Ex. C, p. 190, lines 9-14; Decl. of Anthony LaGiglio ¶¶ 29-36; Decl. of Anthony Green, ¶¶ 31-37. )

40.    The dealership develops various financing sources by contracting with finance companies affiliated with the Manufacturers, finance companies independent other Manufacturers, commercial banks and credit unions (hereinafter, at times, the "Financing Sources"). [Ex. B ¶ 24]

Response: Agreed.

41.    Examples of Dealer Agreements with the Finance Sources are attached hereto as Exhibits 5, 6 and 7 and made a part hereof ("Finance Agreements"). [Ex. B ¶ 25]

Agreed.

42.    When a consumer requests that Willowbrook assist in obtaining financing, the Sales Manager first receives a written authorization from the consumer to obtain a credit report of the consumer; and the Sales Manager cannot obtain a credit report without the consumer's written authorization or electronic authorization. [Ex. B ¶ 26]

Response: Agreed.

43.    The Sales Manager also has the consumer fill out a credit application,

including the consumer's employer, employer's address, length of employment, income, residence, length of residence, rent or mortgage liability and references (hereinafter, collectively, the "Credit Information") [Ex. B ¶ 27]

Response: Agreed.

44.    Typically, the Finance Source look for consumers to have approximately a two-year period of employment and a two-year length of resident in order to be approved. [Ex. C, p. 156, line 15-23; Ex. B ¶ 51]

Response:  Agreed.

45.    The consumer's Credit Application and credit report, along with the vehicle to be purchased, the transaction's financial details (down payment, loan amount, the term of loan) is submitted to the various Financing Sources in an effort to provide the consumer with the best financing terms. [Ex. B ¶ 28]

Response:  Agreed.

46.    When a Finance Source approves the consumer's financing, a Retail Installment Contract, evidencing the motor vehicle loan, is assigned to the Financing Source as the lender. [Ex. B ¶ 29].

Response:  Agreed.

47.    The Financing Sources rely on the truth and accuracy of the consumer's credit information submitted by Willowbrook's Sales Managers to determine if it will make a motor vehicle loan to the consumer. [Ex. B ¶ 30]

Response:  Agreed.

48.    In the event false information is submitted to the Financing Source, Willowbrook is required to repurchase the retail installment contract, and reimburse all fees and costs. [Ex. B ¶ 31;Ex. E ¶ 21]

Response:  Agreed.

49.    The Exeter Finance Agreement governs matters between the parties, including: (i) Representations and Warranties of Dealer as to Each Contract; (ii) Credit Application; (iii) Fraud; (iv) Contract Repurchase.  [Ex. B ¶ 32]

Response: Agreed.

50. The Hyundai Capital America Dealer Retail Agreement (Finance Agreement), governs matters between the parties including assignment of contracts and indemnification. [Ex. B ¶ 33]

Response: Agreed.

51. The Drive Financial Services LP (an affiliate of Santander Bank) Dealer Retail Agreement (Finance Agreement) governs matters between the parties related to dealer liability, including: (i) repurchase; (ii) transfer of contract; (iii) failure to repurchase; (iv) rights of DFS on breach; and (v) dealer indemnity. [Ex. B ¶ 34]

Response: Agreed.

AUDITS AND <u>D</u>ISCHARGE FOR CAUSE

52. Willowbrook internally audits the sales and financing transactions submitted by its Sales Managers. [Ex. B ¶ 35]

Response: Agreed.

53. Willowbrook also retains KPA, an independent company, to audit its sales and financing transactions submitted by its Sales Managers. [Ex. B ¶ 36]

Response: Agreed.

54. As a result of Willowbrook's audit policies, in late 2018-early 2019, Willowbrook became aware of certain discrepancies in the sales and finance files of the Plaintiff. [Ex. B ¶ 37; Ex. E ¶ 20]

Response: Disagree. Plaintiff has no knowledge of these incidents, and Defendant has provided no documentation to substantiate these claims.

55. After being confronted with the discrepancies in the documents, the Plaintiff claimed the discrepancies were unintentional errors. [Ex. B ¶ 38]

Response: Disagree.

56. At that time, Willowbrook advised Plaintiff that Willowbrook had a double

audit system to uncover such discrepancies because they were unacceptable and jeopardized its relationship with its Manufacturers and Financing Sources. [Ex. B ¶ 39]

Response: Disagree. Plaintiff has no recollection of this conversation.

57. In response, the Plaintiff stated he would be more careful. [Ex. B ¶ 40]

Response: Disagree. Plaintiff has no recollection of this conversation.

58. Notwithstanding, on April 29, 2019, Willowbrook made the Plaintiff sign an integrity agreement (hereinafter referred to as the "Integrity Agreement") which stated, in part, that Willowbrook will not tolerate any type of misrepresentation of an individual's income, job time, employer, employment status, residence, residence time or residence status ...". [Ex. B ¶¶ 41-42; Ex. E ¶¶ 19-20]

Response: Agreed.

59. In 2020, after the execution of the Integrity Agreement by the Plaintiff, Willowbrook's audits revealed numerous additional discrepancies in the Plaintiff's files. [Ex. B ¶¶ 43-48]

Response: Disagree.

60. Plaintiff's files revealed the failure of the Plaintiff to obtain the required written authorizations or electronic authorizations for credit reports for the following consumers: (i) Casalino; (ii) Mitchell; (iii) Bulow; and (iv) Gjorgiev. [Ex. B ¶ 49]

Response: Disagreed. Plaintiff does not have information to confirm that these authorizations were actually missing, and disputes that he was responsible.

61. Plaintiff admitted that his signature was on the Casalino, Mitchell, Bulow and Gjorgiev transactions, but could not recall the details of the transactions, and could not account for the lack of a credit report authorization from the customers. [Ex. C, p. 200, line 8 -p. 206, line 8; p. 216, line 3 -21;p. 219, line 1-p. 221, line 8; p. 221, line 23 -p. 226, line 7; Ex. 34-44]

Response: Agreed that Plaintiff's signature is on the documents. However, Plaintiff was not able to review the entire file and determine whether the documents are indeed missing, or to determine how that might have happened.

62.     Plaintiff's files also revealed alterations of the information that had been provided by the consumers, including (i) length of employment, (ii) income, (iii) length of residency, and (iv) mortgage and rent payment liability. [Ex. B ¶ ¶ 50-53]

Response: Plaintiff agrees that the documents appear to have been altered, but disputes the claim that he was responsible for the alterations. [Ex. C, p 263, lines 15-21]

63.     These alterations make applications, that would not comply with the lender's requirements as to job length, residence length, and income, appear to be acceptable. [Ex. B ¶ 54]

Response: Agreed.

64.     One example of an altered file is the Sarna file, where Mr. Sama signed a credit application that stated his length of employment was 1.5 years and his mortgage/rent payment was $500.00, however, the application submitted to Kia Motors was altered to increase his employment length to two years and his mortgage/rent at zero. [Ex. B ¶ 51]

Response: Agreed as to the contents of the document.

65.     Plaintiff admits that he was the Sales Manager on the Sama deal, but contends that someone else -perhaps the Finance Manager -altered the application. [Ex. C, p. 187, line 20 -p. 199, line 3; Ex. 29-33]

Response: Agreed.

66.     Another example is the Jandek file, where Ms. Jandek signed a credit application indicating a mortgage/rent payment of $1,995.00 per month, however, the application submitted to the lender was altered to show a mortgage/rent payment of $500.00 per month. [Ex. B ¶ 51]

Response: Agreed as to the contents of the document.

67.    Plaintiff admits that he was the Sales Manager on the Jandek deal and that the amount of mortgage/rent payment was altered, and that it could have been submitted by him, but contends that there is no proof.  [Ex. C, p. 167, line 20 -p. 175, line 10; Exs. 20-23]

Response: Agreed.

68.    Another example is the Niedzwiecki deal, where Mr. Niedzwiecki signed a credit application indicating his length of residence was 1.3 years and his mortgage/rent payment was $3,181.00. The application submitted to the lender was altered to show his length of residence as 2 years and his mortgage/rent at $1,500.00. [Ex. B ¶ 51]

Response:  Agreed as to the contents of the document.

69.    Plaintiff admits that he was the Sales Manager on the Niedzwiecki deal, but that he doesn't recall the deal, and that the Finance Manager could have submitted a different credit application to go ahead and get a better deal, but also admits that before the customer goes to the finance department, the financing details are already determined. [Ex. C, p. 175, line 21 -p. 187, line 19; Exs. 24-28]

Response:  Disagree.  Plaintiff does not state that the financing details are already determined prior to going to the finance department.  Plaintiff maintains that the Finance Manager is the one who determines the financing details for each transaction, and has the ability to alter and correct applications.

70.    Plaintiff's signature appears on the recap sheet, which states the financing terms, quoted interest rates and payments for each of the transactions in question; and demonstrates his failure to comply with company standards and Finance Source Agreements.  [Ex. B ¶ 56; Ex. E ¶ 7-11]

Response:  Disagree.  The finance sheet purporting to be Mr. Niedzwiecki's has no name on it, so it's impossible to tell what transaction this sheet is for.  Moreover, this in no way demonstrates Plaintiff's failure to comply with company standards.  [Ex. 27 to Ex. C]

71.    Plaintiff admits that Finance Managers do not have access to VinSolutions

and do not have passwords for VinSolutions. [Ex. C, p. 283, line 17 -p. 284, line 5; Ex. E if

12]

Response:  Agree.  Finance Managers did not have access to VinSolutions

therefore, they would work on someone else's Vinsolutions account.  [Ex. C. p. 283, lines

11-16]

72.    Plaintiff receives commission for each transaction that results in a sale,

however, the Finance Manager does not. [Ex. B ¶ 57; Ex. C, p. 234, line 22 -p. 225, line 5;

Ex. E ¶ 15]

Response: Agree.

73.    Plaintiff's actions jeopardize the consumer's ability to comply with their

automobile loan as these alterations obtain a loan for the consumer that the consumer was

not qualified for based on the consumer's income, liabilities or residential history. [Ex. B ¶

58]

Response:  Disagree.  Incorrectly assumes Plaintiff was responsible for these

altered transactions.

74.    The alteration of the customer's financial information is a violation of the

Integrity Agreement that was signed by the Plaintiff and jeopardizes Willowbrook's

relationships with its Finance Sources and Manufacturers. [Ex. B ¶  55]

Response:  Agreed.

75.    On July 27, 2020, the Plaintiff was terminated for altering consumer
information

on loan applications, violations of the Integrity Agreement he signed, running credit reports

without written authorization from the consumer, and various other infractions as are set

forth above. [Ex. B ¶ 59; Ex. D, p. 38, line 17 -p. 45, line 5; line p. 126, lines 4 - 14]

Response:  Disagree.  Plaintiff was not informed of the reason for his termination.

[Ex. C, p. 83, lines 8-17] Defendant has provided no contemporaneous written document

containing an explanation for Plaintiff's termination.  Plaintiff maintains his termination

was related to his race, color, and/or national origin.

76.     There was a delay in identifying some of the altered transactions because KPA only conducted audits on a quarterly basis and because KPA did not conduct any on-site audits for several months during the height of the COVID-19 pandemic. [Ex. B if 46; Ex. D, p. 173, lines 20 - 22]

Response:  Plaintiff has no information regarding the truth or falsity of this statement.

77.     There is no evidence of any other manager at Willowbrook being tied to transactions with altered transactions or missing credit applications. [Ex. D, p. 44, line 2 - p. 45, line 5; Ex. B ¶ 60]

Response:  Plaintiff has no information regarding the truth or falsity of this statement.

78.     There is no evidence of any of Willowbrook managers outside of the protected classes being treated more favorably. [Ex. B ¶¶ 62-63, 65-66]

Response:  Disagree.  Evidence in the record indicates that a White employee, Dragan Markovski was not disciplined despite losing the company over $4000 when he sold the wrong vehicle.  (Ex. D, p. 57, lines 13-24.)

79.     Plaintiff's employment was not terminated on the basis of his race, color or national origin. [Ex. B ¶ 61]

Response:  Disagree.

80.     At the outset of this litigation, Willowbrook filed a comprehensive Rule 11 Motion to Dismiss and for Sanctions, which was denied without prejudice by Judge Dow, stating that in pertinent part:

> "[I]f Defendants are correct in their assertion that the incontrovertible evidence will show that Plaintiff 'altered customer financial information in order to make automobile sales,' and that he was aware of his own misconduct prior to the filing of this lawsuit-i.e., that he had been properly trained on how to ethically do his job and knowingly engaged in shady or illegal actions-then he could be personally sanctioned for fomenting vexatious litigation."

[Dkt. 56, p. 10; Ex. B ¶¶ 67-70]

Response:  Agree as to the existence of the Rule 11 Motion and the statement of the

Judge.  However, it should be noted that the Judge denied the motion, indicating that he did not believe that this was the case. In addition, Defendants allegation that Plaintiff's counsel sought out additional Plaintiff's to bring actions against defendants is without merit. (Decl. of Calvita J. Frederick ¶ ¶ 4-7, 12)

Dated: May 22, 2023

                        Respectfully submitted,

                        JARED PRYZCZ

                       By;      s/ Calvita J. Frederick
                                Attorney for Plaintiff

Calvita J. Frederick
Post Office Box 802976
Chicago, Illinois 60680-2976
312-421-5544
ARDC # 6184001

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on this ___22nd___ day of May 2023, she caused a copy of the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT'S RULE 56.1 STATEMENT OF UNCONTESTED FACTS** was filed with the Clerk of Court for the United States District Court for the Seventh Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the District Court CM/ECF system:

                                s/ Calvita J. Frederick
                                Calvita J. Frederick
                                Attorney for Plaintiff