UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JARED PRYSZCZ, <br><br> Plaintiff, <br><br> v. <br><br> WILLOWBROOK FORD, INC. AND BRIAN ZAWARUS, <br><br> Defendants. | No. 21 C 2538 <br><br> Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Jared Pryszcz alleges that his former employer Willowbrook Ford, Inc. and its General Manager Brian Zawarus terminated him because of his race, color, and national origin. Defendants move for summary judgment. R. 82. For the following reasons, that motion is denied.

**Background**

Willowbrook Ford, Inc. ("Willowbrook") operates adjacent Ford and Kia dealerships in Willowbrook, Illinois. R. 84 ¶ 5. Brian Zawarus serves as the general manager for both dealerships, but each dealership has its own finance and sales managers and sales staff. *Id.* ¶ 7. Jared Pryszcz worked as a sales manager at the Kia dealership from August 2018 through July 2020. *Id.* ¶¶ 13, 75. Pryszcz is Arab-American; his father is Jordanian but he uses his mother's surname, which is of Polish origin. *Id.* ¶ 10.

At Willowbrook, sales managers like Pryszcz were in charge of obtaining customer authorizations to run credit reports, having customers fill out credit

1

applications, and submitting the credit applications and reports to Willowbrook's financing sources through a program called VinSolutions. *Id.* ¶¶ 39, 42–46. Pryszcz received a commission for each transaction resulting in a sale. *Id.* ¶ 72.

Willowbrook audits the sales and financing transactions submitted by its sales managers on an ongoing basis. *Id.* ¶¶ 52–53. Willowbrook states that in the course of one of those audits between late 2018 and early 2019, Willowbrook's Vice President of Operations Michael Meyer became aware of some discrepancies in Pryszcz's sales files. *Id.* ¶ 54. Willowbrook claims that it confronted Pryszcz about these discrepancies, which Pryszcz denies. R. 114 ¶ 55. On April 29, 2019, Willowbrook made Pryszcz and other employees sign an "integrity agreement," which stated in part that Willowbrook would not "tolerate any type of misrepresentation of an individual[']s income, job time, employer, employment status, residence, residence time, or residence status" and that any violation would "result in immediate termination of employment." *Id.* ¶ 58; R. 91 ¶ 11.

According to Willowbrook, audits from April 2020 through July 2020 revealed other discrepancies in Pryszcz's files, including the absence of the required authorizations for credit reports for four customers and alterations of credit information for three other customers. R. 84 ¶¶ 59–70. Pryszcz was never counseled or disciplined for these discrepancies. R. 91 ¶ 11. But he was written up for failing to order a seat for a customer's vehicle and on July 22, 2020 for failing to include a check request from the customer for the last three payments, costing Willowbrook $2,386.00. R. 84 ¶¶ 16, 29.

On July 27, 2020, Pryszcz was fired. *Id.* ¶ 75. He claims that during the termination discussion, Zawarus told him that he belonged in a "sub-prime store," which Pryszcz describes as "a store with low credit, low income, usually a minority population[.]" Pryszcz Deposition Transcript, R. 95 ("Tr.") at 83–84.[1] Zawarus denies making the "sub-prime" store comment when he fired Pryszcz. R. 84 ¶ 19. Mende Talevski, a general sales manager, claims he was present for the discussion and denies that Zawarus made the comment. *Id.* Pryszcz insists that Talevski was not present, and that Zawarus alone fired him. R. 91 ¶ 19. It is undisputed that Pryszcz was not told during the termination discussion that he was being fired for the seven discrepancies. *Id.* ¶ 8.

Further, Pryszcz claims that Zawarus and other employees would joke and verbally taunt him about his Arab descent. *Id.* ¶¶ 1, 5. He cites one instance where a co-worker, Bill Parks, asked Pryszcz what he had in his jacket, and when Pryszcz asked Parks what he meant, Parks responded, "an explosive." *Id.* ¶¶ 2, 6. Pryszcz does not recall reporting this or any other incident to management. R. 84 ¶ 21; R. 114 ¶ 17. Willowbrook does not track the race or national origin of its employees, and its longtime chief financial officer is of Arab descent. R. 84 ¶ 11. Talveski attests that he never witnessed Zawarus comment on Pryszcz's race or national origin, or that of any customer. R. 98-4 ¶¶ 4, 5.

---

[1] Federal Rule of Civil Procedure 56(c)(3) provides that the Court may, but need not consider materials that are not cited by the parties. Where the Court has chosen to consider facts that are not cited in the parties' statements of facts, it has included a direct citation to the record.

3

The record includes affidavits from two former Willowbrook employees: Anthony LaGiglio and Anthony Green. LaGiglio worked as a sales manager at the Ford dealership, while Green worked for four days as a salesman at the Ford dealership before being promoted to sales manager and transferring to the Kia dealership. R. 98-1 ¶¶ 3, 4. Both attested that they saw they saw Zawarus "pick on" Pryszcz on a daily basis and heard him state that Pryszcz belonged at a sub-prime store or his talents were better suited for such a store. R. 91 ¶¶ 7, 18. They also stated that Zawarus often made racist, derogatory comments about customers who appeared to be African-American, Hispanic, or Muslim. *Id.* ¶ 4. Zawarus's comments referenced not only customers' dress and speech but also the unlikelihood that they would be able to purchase a vehicle. *Id.* Moreover, both LaGiglio and Green said that finance managers were ultimately responsible for verifying the financial information supplied by customers. *Id.* ¶ 15.

Pryszcz timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission and received a notice of right to sue. R. 84 ¶ 3. On May 11, 2021, Pryszcz filed his complaint alleging race, color, and national origin discrimination in violation of Title VII and race discrimination in violation of 42 U.S.C. § 1981. *See* R. 1. Defendants now move for summary judgment on those claims. *See* R. 82.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

I.  Title VII Discrimination

When a plaintiff alleges that he suffered adverse employment actions because of a protected characteristic, the "central question at issue is whether the employer acted on account of the plaintiff's race (or sex, disability, age, etc.)." *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013). At summary judgment, the question is "'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [membership in a protected class] caused the discharge or other adverse

5

employment action.'" *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

A plaintiff may prove discrimination in a holistic manner, by proffering "either direct or circumstantial evidence that supports an inference of intentional discrimination." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 932 (7th Cir. 2020) (citation omitted). Direct evidence is "what [the employer] said or did in the specific employment decision in question." *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720 (7th Cir. 2005). Circumstantial evidence is "evidence which allows the trier of fact to infer intentional discrimination by the decisionmaker." *Id.* That evidence may include "ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll*, 953 F.3d at 932.

Pryszcz relies on three categories of evidence. First, he focuses on evidence that tends to cast doubt on Defendants' claim that they fired him because he altered credit information to make customers appear more creditworthy and ran credit reports without the required written authorizations on seven occasions. Defendants say they uncovered the discrepancies in the course of audits between April and July 2020. Yet there is no documentation of any audit or any audit findings in the record. That is particularly surprising given Willowbrook's use of a third-party audit vendor. Additionally, Pryszcz argues that if Willowbrook had found discrepancies in his work, Willowbrook policy required that he be fired immediately. If Defendants discovered even a single discrepancy of the serious nature they describe as early as April, it is

unclear why they would wait until the end of July to fire him. Though it is true that counsel for Defendants notified Pryszcz's counsel about the discrepancies in Pryszcz's customer files in December 2020, that does not speak to whether they had uncovered them prior to firing Pryszcz five months before.[2]

Further, Pryszcz highlights that Defendants never discussed the seven instances of discrepancies with him. Pryszcz had received disciplinary write-ups on other occasions, including one issued five days before his termination for failing to request final payment from a customer. But there are no disciplinary write-ups in the record for these seven incidents. That Defendants never issued disciplinary write-ups for any of the incidents, and indeed, never even discussed this grave misconduct with Pryszcz, tends to suggest that misconduct was not the reason that Pryszcz was fired.

Pryszcz also insists that he was not responsible for any alterations in customer credit information, and explains that finance managers had the ultimate responsibility for checking the accuracy of that information. LaGiglio and Green likewise attest to their understanding that finance managers were in charge of

---

[2] A text message from LaGiglio suggests that Willowbrook did not check Pryszcz's files until the day it received a letter from Pryszcz's former counsel about this case. *See* R. 91-4 ("They just ran into a [sic] emergency meeting freaking out. They are freaking out. So they are pulling all the deals he worked on and all the credit apps he was attached to."). Pryszcz's former counsel, Calvita Frederick, detailed the text in an affidavit and attached a copy. *See* R. 91-3, 91-4. Defendants ask the Court to strike both items because Frederick cannot act as both an advocate and a witness under Rule of Professional Conduct 3.7 and it contains attorney-client communications. However, Frederick is no longer representing Pryszcz, and any applicable privilege is not Defendants' to assert. Moreover, assuming LaGiglio is available to testify at trial, such arguments, along with any hearsay objections, are likely moot.

verifying the information supplied by the customer.[3] Relatedly, Pryszcz questions whether there were actually any missing authorizations given what Defendants acknowledge are incomplete customer files in the record.[4] Defendants emphasize that Pryszcz admits that there were alterations, he was the only sales manager of record on the transactions in question, and his signature appears on the relevant documents. But even if it were true that Pryszcz was responsible for the alterations and omissions, there remain questions about the timing of that discovery and of Defendants' action (or inaction) in response. In that way, there is a genuine issue of whether the cited misconduct was the reason Defendants fired Pryszcz, as opposed to a pretextual, after-the-fact justification.

Next, Pryszcz focuses on the evidence of Zawarus's statements during the termination discussion. Though, at the outset, it is notable what Zawarus did not say. Zawarus did not tell Pryszcz the reason he was being fired. Defendants maintain that

---

[3] Defendants ask the Court to strike attestations by LaGiglio and Green regarding the responsibilities of a finance manager, including that it was their "job to verify all the information stated on the credit application, and to make sure all forms are signed per compliance requirements." R. 91-1 ¶ 33; R. 91-2 ¶ 35; *see also* R. 91-1 ¶¶ 29–37, 41, 44–45, 47; R. 91-2 ¶¶ 29–38, 42, 45–46, 48. Defendants argue that neither LaGiglio nor Green has personal knowledge of these facts because they never served in the finance manager role or in a human resources capacity. Nonetheless, LaGiglio and Green can certainly testify to what they understood Willowbrook's finance managers' responsibilities to be based on their observations as employees. The Court declines to strike these assertions. However, because LaGiglio did not work at the same dealership at Pryszcz, his assertions on the topic are substantially less relevant.
[4] Defendants state that if Pryszcz needed additional documents, he should have asked for them in discovery. But if the documents exist and support their motion, it makes little sense that Defendants would not put them in the record and use them to their benefit. *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024) ("Summary judgment is the put up or shut up time in litigation.").

8

Illinois law does not require them to do so. R. 97 at 10. That may be true. But, as stated, it is striking that after having supposedly uncovered multiple instances of missing and altered documents in Pryszcz's customer files in the preceding months—and deciding to terminate him for that misconduct—Zawarus said nothing about it in the course of firing Pryszcz.

As for what Zawarus did say during the termination discussion, according to Pryszcz, Zawarus told him that he belonged in a "sub-prime" store. Zawarus denies making the statement, but at the summary judgment stage, the Court assumes that he did. *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999).[5] The parties agree that "sub-prime" refers to individuals with challenged credit, but they disagree about whether it also carries a race-related connotation. Pryszcz understood the comment to relate to the reputation of "sub-prime" stores as serving primarily minority customers. Defendants emphasize that Pryszcz admitted to working at a "sub-prime" dealership before Willowbrook and argue that even if Zawarus made the comment, there was nothing racially-charged about telling Pryszcz that he was better suited for a dealership like the one he used to work at. R. 114 ¶ 18. Even so, at the very least, the "sub-prime" comment is open to more than one reasonable interpretation, including one supporting an inference of discrimination, and ultimately "[a] jury is the appropriate body to evaluate the significance of [ambiguous] statements." *Mullin*

---

[5] The parties also dispute who was in the room when the statement was purportedly made. Zawarus and Talevski claim they were both present, while Pryszcz and LaGiglio insist there was no one else there except Pryszcz and Zawarus. This he said-he said dispute cannot be resolved at this stage.

9

*v. Temco Machinery, Inc.*, 732 F.3d 772, 778 (7th Cir. 2013); *see also Joll*, 953 F.3d at 932 ("Some ambiguity inheres in all employer remarks that fall short of admitting discrimination while still supporting an inference of it. This ambiguity is the very reason the jury must be called.").

Finally, Pryszcz focuses on evidence of Zawarus's and other employees' treatment of Pryszcz and minority customers. It is this context that allows the reasonable inference that the "sub-prime" comment was about Pryszcz's protected characteristics. Beginning with Pryszcz's testimony, he states that Zawarus and others regularly joked and taunted him about his Arab descent, and recalled an incident where a co-worker accused him of having an explosive under his jacket. Adding to that testimony are the attestations by LaGiglio and Green that Zawarus picked on Pryszcz on a daily basis, told Pryszcz he belonged in or was better suited for a "sub-prime" store, and often made racist, derogatory remarks about minority customers, including comments about their ability to purchase a vehicle.

Defendants challenge this evidence on a variety of grounds. To begin, they seek to strike the Green and LaGiglio affidavits pursuant to Federal Rule of Civil Procedure 56(c)(4). That rule provides that affidavits submitted in response to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Personal knowledge may include "reasonable inferences" so long as those inferences are "grounded in observation or other first-hand personal experience" and are not "flights

10

of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (citation omitted).

Defendants argue that LaGiglio lacks personal knowledge because he worked at the Ford dealership, not the Kia dealership where Pryszcz worked. The dealerships were adjacent and both were managed by Zawarus, though they had separate finance and sales staffs. LaGiglio does not explain how he would have been able to observe Zawarus's treatment of Pryszcz on a daily basis. Therefore, the Court strikes that fact. But, working at the Ford dealership, LaGiglio would have been able to directly observe Zawarus make comments about minority customers. He also explains how he was able to observe the termination discussion: he was at the Kia dealership that day. Those facts are properly within LaGiglio's personal knowledge, and the Court considers them here.

Defendants also contend that Green lacks personal knowledge of Pryszcz's experiences. Yet Green worked at the Kia dealership with Pryszcz, which was managed by Zawarus, so it is reasonable that he would have observed how Zawarus and others spoke about and interacted with Pryszcz and how Zawarus referred to customers among co-workers.[6]

---

[6] Defendants ask the Court to strike statements related to allegations of sex discrimination by other former Willowbrook employees. The Court agrees that these facts are irrelevant to this case, and strikes paragraphs 12–17 and 52 in R. 91-1 and paragraphs 17–22, 53 in R. 91-2. Defendants also seek to strike statements related to what Pryszcz would have known about a deal after a finance manager became involved and whether everyone, including Zawarus, knew that Pryszcz was of Arab descent. Because LaGiglio and Green do not provide a sufficient basis for their personal knowledge of these matters, *see* Fed. R. Civ. P. 56(c)(3), the Court strikes these assertions.

11

Defendants' effort to strike the affidavits in their entirety on credibility grounds is unavailing. "The fact that the affidavits use almost identical words and obviously were drafted by a lawyer" is not a basis for striking them. *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). Moreover, even if Defendants are correct that Green is "disgruntled" and LaGiglio's ongoing, positive communications with management belies his assertion that he quit because he "could no longer take the abuse," it has no bearing on either former employee's personal knowledge of Zawarus's interactions with Pryszcz and comments about customers. Jurors may believe Green and LaGiglio, or they may not for the reasons that Defendants articulate. But such credibility matters are not a basis to strike the affidavits.

Relatedly, Defendants deny that management was aware that Pryszcz, who has a Polish surname, was of Arab descent, noting that Willowbrook did not track the race or national origin of its employees. They add that Willowbrook's longtime chief financial officer has Arabic ancestry. Defendants further highlight the lack of specifics in Pryszcz's claim that Zawarus and others teased him about his background, Talevski's attestation that he never heard Zawarus comment on Pryszcz's race or national origin or any customer's race, and the fact that Pryszcz does not recall whether he complained to management about the alleged harassment.

At its core, this case pits one party's word against the other's. A jury might believe Defendants that they fired Pryszcz because they honestly believed that he altered and omitted customer transaction documents. Or a jury may believe

12

Defendants manufactured that justification after the fact and instead fired Pryszcz because of his protected characteristics. Ultimately, the Court cannot make the credibility determinations that would be necessary to rule in Defendants' favor. *See Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 893 (7th Cir. 2018) ("As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants."). Because viewing all of the evidence in the light most favorable to Pryszcz, a reasonable jury could conclude that his race, color, or national origin was the real reason he was fired, the Court denies the motion for summary judgment on the Title VII claims.[7]

## II. Section 1981 Race Discrimination

"Section 1981 protects the right of citizens regardless of race in the context of employment to have the same right to enforce and make contracts." *Singmuongthong v. Bowen*, 77 F.4th 503, 507 (7th Cir. 2023) (citing *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. 327, 333 (2020)). Section 1981 and Title VII claims have "largely identical" legal analyses. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). But while Title VII claims require that race is a "motivating factor" of the adverse employment decision, § 1981 claims require that race is a "but-for cause" of the injury. *Id.* (citing *Comcast*, 589 U.S. at 333). As with

---

[7] The parties also raise arguments under the *McDonnell Douglas* burden-shifting framework. Defendants say that Pryszcz fails to provide evidence of "similarly situated employees who were treated more favorably." *Reives v. Ill. State Police*, 29 F.4th 887, 891 (7th Cir. 2022). Even though this Court tends to agree, it is unnecessary to address comparators because there is other direct evidence in the record that creates a triable issue as to whether Pryszcz was fired because of his protected characteristics.

Title VII, the dispositive question is whether the evidence permits a reasonable factfinder to conclude that the plaintiff's race caused the discharge. *Ortiz*, 934 F.3d at 765.

Defendants first argue that Pryszcz cannot establish race was the but-for cause of his termination because he also claims discrimination based on color and national origin. The distinction Defendants seek to draw is belied by Supreme Court precedent. In *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987), the Supreme Court explained that with § 1981, "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." If a plaintiff "can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981." *Id*. That is precisely what Pryszcz seeks to prove here: that Defendants discriminated against him based on his Arab ancestry.

Defendants further argue that Pryszcz cannot satisfy the but-for standard because he pointed to other reasons for his termination during his deposition. Defendants highlight Pryszcz's testimony about being put under a "microscope" because they wanted to develop a used car manager and he was "more of a new car manager," and his "feeling" that his termination was related to his refusal to make a declaration in connection with Green's wrongful termination matter. Tr. at 72–73, 260–62. But Pryszcz also testified directly that when Zawarus told him he belonged

14

at a "sub-prime" store in the course of firing him, Pryszcz believed that statement to be about his race. Tr. at 304. Viewing this testimony along with the evidence previously discussed in the light most favorable to Pryszcz, a reasonable factfinder could conclude that Pryszcz's Arab descent was the but-for cause of his termination. Summary judgment is denied as to the § 1981 claim.

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is denied.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: April 19, 2024